UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**GERALD N. OWENS**,                          Case Number 3:11 CV 2690

    Plaintiff,                          Judge Jeffrey J. Helmick

    v.                          REPORT AND RECOMMENDATION

**COMMISSIONER OF SOCIAL SECURITY**,

    Defendant.                          Magistrate Judge James R. Knepp II

### INTRODUCTION

Plaintiff Gerald N. Owens filed a Complaint (Doc. 1) against the Commissioner of Social Security seeking judicial review of the Commissioner's decision to deny supplemental security income (SSI). The district court has jurisdiction under 42 U.S.C. § 1383(c)(3). This matter has been referred to the undersigned for a Report and Recommendation pursuant to Local Rule 72.2(b)(1). For the reasons stated below, the undersigned recommends the Commissioner's decision be affirmed.

### PROCEDURAL BACKGROUND

On October 13, 2006, Plaintiff filed an application for SSI alleging a disability onset date of May 13, 2004.  (Tr. 23, 133-35).  Plaintiff alleges he is disabled due to depression, schizophrenia, bipolar disorder, severe headaches, and a heart condition. (Tr. 164). Plaintiff's claims were denied initially (Tr. 95-97) and upon reconsideration (Tr. 99-101). Plaintiff requested a hearing before an administrative law judge (ALJ). After a hearing, where Plaintiff, his attorney, and a vocational expert (VE) appeared, the ALJ denied Plaintiff's claims. (Tr. 20-33). The ALJ found Plaintiff had severe impairments but could perform a full range of work with specific nonexertional limitations.

(Tr. 25, 27). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 4); 20 C.F.R. §§ 416.1455, 416.1481. On December 12, 2011, Plaintiff filed the instant case. (Doc. 1).

### FACTUAL BACKGROUND

Plaintiff was 42 years old at the time of the ALJ hearing. He has a history of cocaine abuse and was incarcerated during his application period for charges related to drug trafficking, assault, and theft. (Tr. 289). Plaintiff has no past relevant work experience pursuant 20 C.F.R. § 416.960(b)(1)[1]; however, Plaintiff reported working as an antique store sales clerk (Tr. 56), warehouse machine worker (Tr. 57), and pit bull breeder (Tr. 71-72). Plaintiff also reported working as general factory laborer from 1990 until 2006. (Tr. 172). When questioned by the ALJ about his relevant work experience, Plaintiff did not mention working as a general laborer for the sixteen years he previously reported. Instead, Plaintiff claimed he worked in a warehouse for no more than three weeks. (Tr. 57). In another preliminary disability report, Plaintiff reported working as a general laborer for a plastics company and as security for "Uncle Buck". (Tr. 201). Plaintiff also reported working in prison as a sales clerk at the commissary store. (Tr. 204). On July 27, 2009, Plaintiff's counsel provided the Social Security Administration ("SSA") with an employment history list. None of the positions described above were listed (Tr. 261-62); rather, Plaintiff stated he worked as a valet, food stocker, bouncer, cook, and supervisor at Home Depot. (Tr. 261-62).

Plaintiff claims he did not graduate high school (Tr. 53), but medical reports and statements by his deceased wife reflect Plaintiff graduated high school in 1985 and attended college for two

---

1. Past relevant work is limited to work within the past fifteen years that was performed long enough to learn how to do it and that reached the level of substantial gainful activity. § 416.960(b)(1).

years. (Tr. 182, 289, 300, 307, 364).

***Disability Reports and Daily Activity***

Plaintiff's testimony, his own reports, third party reports, and medical reports are extremely inconsistent concerning Plaintiff's daily activity. For instance, on November 3, 2006, Plaintiff's now deceased wife, Mrs. Hill-Owens, reported Plaintiff "engage[d] in normal activities" such as household chores, working out, reading, attending church, and watching television. (Tr. 181). Mrs. Hill-Owens also reported Plaintiff was sometimes obsessive about cleaning, socialized with his family daily, and went to movies and the library. (Tr. 182, 185). In 2006, Plaintiff reported he reads, plays basketball and writes poetry "very often", but in the same report stated he does not go anywhere and has a hard time walking up the stairs. (Tr. 197). Later, Plaintiff testified his daily activity included taking his medication and staying in his room all day (Tr. 71).

On November 4, 2006, Plaintiff reported he has suicidal thoughts and mood swings, hears voices, sees shadows, and feels "like [he] [could] kill someone". (Tr. 189). Plaintiff reported having three to four good days in a week, but then stated he had seven bad days. (Tr. 190). He stated his symptoms last "all day" and occur "all the time". (Tr. 190). Plaintiff then reported he cooks daily, makes his bed, and vacuums. (Tr. 196).  In 2007, Plaintiff reported he could not concentrate because he was hearing voices. (Tr. 213).

On May, 23, 2007, Plaintiff's girlfriend Amy Flores filled out a third party function report. Ms. Flores stated she had known Plaintiff for one year, and that she and Plaintiff perform household chores, grocery shop, and go to movies together. (Tr. 219). Ms. Flores reported Plaintiff's daily activity includes watching television and reading, and Plaintiff's household chores include taking out the trash, vacuuming, and doing the dishes. (Tr. 219, 221). She reported Plaintiff shops for

3

clothes, shoes, groceries, or personal care products for about an hour once a week, but Plaintiff is bad with money because he "thinks he can spend it on other things". (Tr. 222-23). She reported Plaintiff is a pleasant person, socializes with friends and family daily, and goes to church every Sunday, but does not like to be in crowded areas (Tr. 223).

On June 1, 2007, Plaintiff filled out a function report. Concerning daily activity, Plaintiff reported he wakes up, takes his medication, and is "kind of out of it" the entire day. (Tr. 229). Plaintiff reported he needs help bathing, shaving, and feeding himself (Tr. 230), despite Ms. Flores's report that Plaintiff can perform these activities on his own (Tr. 220). Plaintiff reported he talks to his family daily and goes to church every Sunday. (Tr. 232).

*Medical Evidence*

**Blanchard Valley Regional Health Center**

On September 19, 2006, Plaintiff presented to Blanchard Valley Regional Health Center ("Blanchard") complaining of chest pain. (Tr. 291). Plaintiff reported drinking 30 beers every two days and using cocaine. (Tr. 291). Plaintiff was positive for palpitations, but negative for all other systems. (Tr. 291). Symptoms improved upon arrival and Plaintiff was discharged with instructions not to use cocaine or stimulants of any kind. (Tr. 290).

On October 29, 2006, Plaintiff was taken to Blanchard by ambulance for a possible overdose. (Tr. 278, 280). On arrival, Plaintiff reported that "he took a few pills, and will do it again". (Tr. 282). Plaintiff denied drug use, but reported using alcohol on a daily basis. (Tr. 286).

On November 1, 2006, Kathleen Steiner, a Blanchard social worker, performed a Psychosocial Assessment of Plaintiff. (Tr. 288). She noted Plaintiff's struggle with drugs, alcohol, and mental health. (Tr. 288). Plaintiff reported hearing voices, mood swings, and irritability. (Tr.

288). Ms. Steiner stated "[Plaintiff] definitely has some mental health problems going on along with [] drug abuse[,] which he readily admits." (Tr. 288). She then noted "perhaps [Plaintiff] has some serious mental illness that is interfering with his ability to be employed." (Tr. 289). Plaintiff reported being in and out of prison most of his adult life, stemming from charges related to drug trafficking, assault, and theft. (Tr. 289). Plaintiff reported drinking consistently and doing cocaine regularly. (Tr. 289). Ms. Steiner concluded Plaintiff would benefit from an inpatient drug unit, but since he did not have insurance Plaintiff was advised to continue treatment with Century Health. (Tr. 290).

Two days later, Plaintiff presented to Blanchard complaining of hallucinations and hearing voices, but denied wanting to harm himself or others. (Tr. 275-76). Plaintiff discussed his "crack/cocaine addiction" and stated "he want[ed] to quit crack but [he] [was] unable to overcome the craving." (Tr. 276). Substance abuse therapy was recommended, but Plaintiff stated he did not find it helpful. (Tr. 276). Plaintiff reported signs of sleeplessness, hyperactivity, and depression. (Tr. 276). However, "[Plaintiff did] not appear mentally ill." (Tr. 276). Plaintiff presented to Blanchard for group therapy on November 1, 2006 and "initially appeared to be dozing [off]" until the discussion turned to religion. (Tr. 276). Plaintiff became "enraged" but "articulate" when discussing religion, and was able to accept criticism and support from the group. (Tr. 276). On November 2, 2006, Plaintiff's condition was stable with no psychotic or manic symptoms. (Tr. 277).

On January 15, 2007, Plaintiff presented to Blanchard complaining of chest pain. (Tr. 411). Plaintiff admitted using cocaine two weeks prior. (Tr. 411). A cardiac catherization report revealed "normal coronary anatomy with no evidence of any obstruction." (Tr. 412). A chest x-ray revealed normal coronary functioning. (Tr. 413). Patient was discharged in satisfactory condition. (Tr. 414). Plaintiff did not mention his mood disorder nor complain of any mood related symptoms.

Plaintiff returned to Blanchard ER with chest pain May 15, 2008. (Tr. 414). On examination Plaintiff's heart rhythm was regular with no murmurs. (Tr. 415). Plaintiff was alert, awake, and in no acute distress, his behavior cooperative, and his mood calm. (Tr. 415).  Mood disorder symptoms were not present, and he was discharged with medication. (Tr. 416).

On July 29, 2008, Plaintiff presented to the ER complaining of blurred vision and jaw pain from being "struck in the back of the head with a chain". (Tr. 417). Attending physicians noted several areas of mild scalp swelling, but no acute fractures. (Tr. 420). Plaintiff was prescribed pain medication. (Tr. 420). Notably, Plaintiff never mentioned symptoms related to his mood disorder.

On June 17, 2009, Plaintiff presented to the ER complaining of a headache. (Tr. 421). Plaintiff was discharged with pain medication in satisfactory condition. (Tr. 421). Once again, Plaintiff did not complain of symptoms related to his mood disorder. (Tr. 421). In fact, Plaintiff was described as "well-appearing, well-developed, [and] well-nourished" in no acute distress. (Tr. 422).

**St. Rita's Medical Center**

On March 25, 2007, Plaintiff was transferred from Blanchard to St. Rita's Medical Center after he attempted suicide by overdose. (Tr. 344). On examination, Plaintiff was very uncooperative and refused to be interviewed. (Tr. 344). However, Plaintiff eventually opened up and stated he was having a hard time dealing with his wife's death. (Tr. 344). His wife, Mrs. Hill-Owen, died in November 2006, at the age of 41. (Tr. 344). Concerning his suicide attempt, Plaintiff stated, "I don't want to die, I guess I did it for attention." (Tr. 344). Plaintiff reported no hallucinations or delusions, and denied symptoms of depression. (Tr. 344). Plaintiff also reported seeking help for his problems and felt his medication helped him, but he had problems with drugs and alcohol. (Tr. 344). Plaintiff reported drinking daily and using crack/cocaine four to five times a month, and admitted to using

two days prior. (Tr. 347). The attending physician noted Plaintiff had been sleeping well, had a good appetite, and denied mood swings, flight of ideas, hallucinations, or racing thoughts, but Plaintiff was irritable. (Tr. 348). Plaintiff was diagnosed with major depressive disorder and his Global Assessment Function ("GAF") score was 30. (Tr. 348). He was instructed to follow-up at Century Health. (Tr. 345).

Plaintiff returned to St. Rita's on June 18, 2007, presenting with suicidal and homicidal thoughts. (Tr. 360). Plaintiff reported he had a gun, but it was with a friend. (Tr. 360). He stated he had been on medication but decided to stop taking it because he did not feel a benefit. (Tr. 360). Plaintiff reported hallucinations and feeling depressed. (Tr. 360). He denied alcohol use, but his blood alcohol level was 0.09. (Tr. 360). Plaintiff eventually admitted using drugs and alcohol after the hospital discovered a warrant for his arrest. (Tr. 361). Plaintiff tested positive for cocaine and admitted to smoking crack/cocaine a few days prior. (Tr. 360, 364). Plaintiff's mental status evaluation revealed Plaintiff was irritable, but goal oriented and alert, with average intelligence and fair concentration and attention. (Tr. 361). Plaintiff reported he graduated from high school and attended college for a year and a half. (Tr. 364). He was diagnosed with major depressive disorder, PTSD, cocaine dependance, and a GAF score of 55. (Tr. 361). He was discharged with medication and instructed to follow-up at Century Health. (Tr. 364).

**Century Health**

Plaintiff began treatment at Century Health following a referral by Plaintiff's correction facility. (Tr. 330). On July 24, 2006, Plaintiff presented to psychiatrist Patricia Shawberry, M.D. for a psychiatric evaluation. (Tr. 330-332). Dr. Shawberry noted Plaintiff's missed appointments and frequent failure to present for psychiatric care. (Tr. 330). Indeed, the record reflects Plaintiff

frequently missed appointments at Century Health. (Tr. 333-42). On examination, Plaintiff reported anger problems, irritability, and feeling stressed out. (Tr. 330). He also reported episodes of decreased energy and hearing voices. (Tr. 330). Plaintiff was cooperative, maintained good eye contact, his thought process was focused, his concentration and attention were fair, and his intelligence was average. (Tr. 393). Dr. Shawberry diagnosed Plaintiff with bipolar disorder NOS and post traumatic stress disorder (PTSD), and noted his GAF score was 55. (Tr. 331). GAF scores in the this range indicate a person with moderate symptom severity.  Diagnostic and Statistical Manual of Mental Disorders, 4th Ed. Text Rev., p. 34 (2005) (commonly referred to as "DSM-IV-TR"). Plaintiff was prescribed medication and encouraged to enroll in individual counseling. (Tr. 332).

On April 26, 2007, psychiatrist Basanti Basu, M.D. evaluated Plaintiff in Dr. Shawberry's absence. (Tr. 407). After listing Plaintiff's diagnoses of bipolar disorder, PTSD, and substance abuse, Dr. Basu described Plaintiff's mood as stable, cooperative, and coherent. (Tr. 435-36). Plaintiff requested the emergency appointment because he needed medication. (Tr. 407). It was noted Plaintiff frequently misses appointments. (Tr. 407).  Dr. Basu noted Plaintiff's medication non-compliance and substance use, opining Plaintiff would benefit from a substance use evaluation. (Tr. 408). Plaintiff admitted using alcohol, crack/cocaine, and cannabis on a regular basis. (Tr. 407).

Dr. Darlene Barnes, a psychologist with prescription privileges, began treating Plaintiff in April 2006. (Tr. 433). Dr. Barnes diagnosed Plaintiff with bipolar disorder with psychotic features (Tr. 424) and consistently prescribed a combination of the following medications: Depakote, Geodon, Lexapro, Trazadone, Zyprexa, and Celexa. (Tr. 397, 402, 439, 448).

On June 14, 2007, Plaintiff informed Dr. Barnes about his history of incarceration and mood

disorders. (Tr. 401). Plaintiff reported testing positive for cocaine three weeks prior and admitted using cocaine two times a week. (Tr. 401). Plaintiff reported hearing the voice of his deceased wife. (Tr. 401). Dr. Barnes noted Plaintiff was cocaine dependant, distracted, irritable, negative, and agitated, but oriented, with fair insight and judgment, and capable of self care. (Tr. 401, 403). Dr. Barnes' objectives centered on drug treatment and medication compliance. (Tr. 402).

Plaintiff returned to Dr. Barnes a month later complaining of mood swings, irritability, and a feeling that people were out to harm him. (Tr. 396-97). Plaintiff denied suicidal ideations and delusions, but was irritable, tense, and agitated. (Tr. 396). On August 2, 2007, Plaintiff reported similar complaints, but with suicidal and homicidal ideations. (Tr. 386). Dr. Barnes' objectives for Plaintiff were medication management, therapy, education, and support. (Tr. 387, 389).

February 2008, Plaintiff returned to Dr. Barnes and reported "seeing [him]self being abducted by aliens". (Tr. 405). Plaintiff denied suicidal thoughts, but felt paranoid and had trouble focusing. (Tr. 405). A month later, Plaintiff returned complaining of memory problems, mood swings, and hearing alien voices from outer space, which tell him to harm himself and others. (Tr. 388-89). Plaintiff reported he had been clean from cocaine for two years (Tr. 388); however, this is inconsistent with other medical reports (Tr. 360, 364). Dr. Barnes' objectives for Plaintiff were medication management, therapy, education, and support. (Tr. 389).

In August 2008, Plaintiff returned for treatment with Dr. Barnes after being incarcerated. (Tr. 384-85). Plaintiff's girlfriend's mother reportedly called police because Plaintiff was intoxicated. (Tr. 384). Plaintiff reported that after his girlfriend picked him up from jail, he jumped out of a truck, walked down an alley, and took off all of his clothes. (Tr. 384). Plaintiff admitted he had not been taking his medication because he "ran out". (Tr. 385). Plaintiff reported hearing voices during

9

the incident leading to his incarceration and after, but he denied suicidal or homicidal ideations. (Tr. 384). Dr. Barnes' objectives for Plaintiff were medication management, therapy, education, and support. (Tr. 385).

In December 2009, more than a year after his last visit, Plaintiff returned to Dr. Barnes complaining of mood swings and stated he was out of medication. (Tr. 447).

***Opinion Evidence***

On December 11, 2006, Plaintiff underwent a psychological evaluation performed by Dr. Alan White at the request of the SSA. (Tr. 298). Plaintiff reported fatigue, feelings of worthlessness and guilt, a loss of interest in formerly pleasing activity, and suicidal ideation. (Tr. 299). Plaintiff reported consuming two to three six packs of beer weekly and occasionally using illicit drugs. (Tr. 299). Dr. White noted Plaintiff had been arrested for domestic violence, possession of crack, robbery, and drunk driving three times, despite not having a license. (Tr. 299). Plaintiff reported he graduated from high school and had maintained a 2.9 grade point average. (Tr. 300). On examination, Plaintiff was passively cooperative and his speech coherent, but he was hyper, restless, and fidgety. (Tr. 301). Plaintiff was diagnosed with bipolar disorder NOS, polysubstance abuse, and bereavement, with a GAF score of 60. (Tr. 302). Scores in this range indicate moderate symptoms. Dr. White opined Plaintiff's ability to maintain attention, concentration, persistence, and pace to perform simple, repetitive tasks is mildly to moderately impaired due to bipolar disorder and depression, but his ability to understand, remember, and follow instructions is not impaired. (Tr. 303). He noted if Plaintiff was found disabled, "a payee would be necessary for management of any assigned funds due to his history of drug and alcohol abuse." (Tr. 303).

On January 12, 2007, Dr. Dorsey Gilliam, M.D. examined Plaintiff at the SSA's request.

10

(Tr. 306). Dr. Gilliam noted Plaintiff's alcohol and drug abuse, and his tobacco use (1.5 pack per day). (Tr. 307). Plaintiff reported graduating high school and attending a year and a half of college. (Tr. 307). Dr. Gilliam opined Plaintiff's speech and hearing were normal and his intellectual functioning was average. (Tr. 307). No physical work restrictions were found, but Dr. Gilliam opined Plaintiff's mental illness could affect his work abilities. (Tr. 307).

On January 12, 2007, Dr. Cynthia Waggoner, a state agency physician, assessed Plaintiff's mental residual functional capacity (RFC). (Tr. 312-14). Dr. Waggoner found Plaintiff's ability to remember work like procedures and understand simple instructions were not significantly limited, but Plaintiff was moderately limited in his abilities to understand and remember detailed instructions and maintain attention for extended periods of time. (Tr. 312). Plaintiff was also moderately limited in all areas of social interaction, but not limited in any areas of adaptation. (Tr. 313). On examination, Plaintiff reported symptoms of anxiety, irritability, and helplessness, but stated he frequently drank alcohol and occasionally used illicit drugs. (Tr. 314). He reported spending time at home, but socializing daily with family. (Tr. 314). Dr. Waggoner concluded Plaintiff was less than fully credible and "retain[ed] the capacity for work that is simple and routine in nature in a low stress environment." (Tr. 314).

In a letter dated October 2, 2006, Plaintiff's treating psychologist Dr. Barnes opined Plaintiff was "totally disabled without consideration of any past or present drug and/or alcohol abuse." (Tr. 270). Dr. Barnes also completed a mental functional capacity assessment for Ohio Job & Family Services on January 28, 2008. (Tr. 380-82). Dr. Barnes diagnosed Plaintiff with major depressive disorder and opined he was not able to consistently concentrate, focus, or retain and hold information. (Tr. 381). She also reported Plaintiff had difficulty processing information and

11

consistently hears voices. (Tr. 381). Dr. Barnes found Plaintiff markedly limited in all areas of understand and memory, social interaction, and adaptation, and she opined Plaintiff was unemployable. (Tr. 382).

In addition, Dr. Barnes completed a Psychiatric/Psychological Impairment Questionnaire on September 3, 2009. (Tr.  424-31). Dr. Barnes listed Plaintiff's diagnosis of bipolar disorder with psychotic features and noted Plaintiff's GAF score was 55. (Tr. 424). Dr. Barnes opined Plaintiff's moods consistently fluctuate and his prognosis was poor. (Tr. 424). Dr. Barnes identified the following clinical findings: poor memory, appetite, sleep, and mood disturbance, delusions, hallucinations, pervasive loss of interest, oddities of thought, perceptual disturbances, social withdrawal, blunt affect, decreased energy, manic syndrome, suicidal ideation or attempts, anxiety, irrational fears, hostility, and irritability. (Tr. 425).  However, Dr. Barnes also noted these clinical findings were based on Plaintiff's self reporting and that "no concrete laboratory tests" could demonstrate support of her diagnosis. (Tr. 425). Dr. Barnes found Plaintiff moderately limited in his ability to remember work-like procedures and one or two step instructions, but markedly limited in his ability to remember detailed instructions and maintain attention for extended periods, . (Tr. 427). Dr. Barnes opined Plaintiff was only moderately limited in his ability to sustain an ordinary routine without supervision, but markedly limited in his ability to maintain regular attendance and make simple work-related decisions. (Tr. 427). She noted Plaintiff has been unable to work because he isolates himself in his home, but stated he there were no other limitations in Plaintiff's ability to perform basic work related activity. (Tr. 429). Dr. Barnes concluded Plaintiff was incapable of low stress work, but did not explain the basis for her conclusion, and noted Plaintiff can manage benefits in his own best interest. (Tr. 430).

*ALJ Hearing & Decision*

On September 9, 2009, Plaintiff (represented by counsel) appeared and testified before the ALJ. (Tr. 39-89). Plaintiff testified he lives with his girlfriend, her two daughters, and their two year old daughter. (Tr. 51-53). Plaintiff also has three adult children from prior relationships. (Tr. 53). Plaintiff testified he went to high school but dropped out in the 12th grade (Tr. 53), which is contradicted numerous times in the record (Tr. 182, 289, 300, 307, 364). Plaintiff testified he had been clean from cocaine for three years and was tested twice a month (Tr. 61), but only provided two negative drug screens from his parole officer from June and July 2009 (Tr. 158). Plaintiff testified he could not work because he did not like being around people and had a hard time following instructions. (Tr. 62). When the ALJ asked Plaintiff if he could sweep, vacuum, and mop, Plaintiff responded yes. (Tr. 63). The ALJ then inquired "[s]o why couldn't you do that, let's say for a church or something like that?" (Tr. 63). Plaintiff responded "[b]ecause there are no jobs like that in [my] city". (Tr. 63). Before being interrupted by counsel, Plaintiff explained the job described by the ALJ would not be hard to do, but Plaintiff thought no such jobs existed in his community. (Tr. 64). Plaintiff then testified he hears voices, stays in his room all day, and does not go anywhere. (Tr. 65-66).

The ALJ then asked the VE if Plaintiff could perform any jobs in the national economy with no exertional limits but with the following nonexertional limitations: all the limitations listed in Exhibit 6F (Tr. 312-16), plus the work must be simple and routine in nature, in a low stress environment that would not require work with the general public or in close contact with fellow workers. (Tr. 85). The VE testified Plaintiff could perform approximately 50 percent of the occupational work base. (Tr. 85-86). Specifically, Plaintiff could work as a hand packager, inspector,

13

or stock clerk as defined in the Dictionary of Occupational Titles ("DOT"). (Tr. 86).

Subsequently, in a decision dated February 23, 2010, the ALJ found Plaintiff not disabled. (Tr. 23-33). The ALJ found Plaintiff had the following severe impairments: bipolar disorder with psychotic features, a personality disorder, and a history of cocaine abuse. (Tr. 25). He noted Plaintiff is frequently described as having a blunted mood with a flat effect, but noted Plaintiff was often pleasant and cooperative. (Tr. 25). Concerning Plaintiff's drug use, the ALJ noted Plaintiff is described as being "unable to overcome his craving for cocaine." (Tr. 25). The ALJ addressed Plaintiff's alleged heart and headache conditions, but correctly noted no medical evidence supports those impairments. (Tr. 26). The ALJ found Plaintiff's impairments did not meet or medically equal a listing requirement, either in combination or individually. (Tr. 26-27).

After careful consideration of the entire record, the ALJ found Plaintiff had the RFC to perform a full range of work at all exertional levels but with the following nonexertional limitations: work must simple and routine in nature, in a low stress environment that would not require work with the general public or in close contact with fellow workers. (Tr. 27-28). The ALJ addressed Dr. Barnes' opinion but gave it no weight, stating, among other things, that Dr. Barnes' opinion was internally inconsistent and inconsistent with the record evidence. (Tr. 31). In addition, the ALJ addressed Dr. Barnes' functional limitation opinion. (Tr. 31). The ALJ gave that opinion little weight because it was based heavily on Plaintiff's subjective complaints, internally inconsistent, and inconsistent with the record evidence. (Tr. 31-32). The ALJ then concluded, based on VE testimony, Plaintiff could perform approximately 50 percent of the unskilled occupational base in the Central Ohio economic region. (Tr. 33). Specifically, Plaintiff could work as an office cleaner, hand packer, inspector, and stock clerk as defined in the DOT. (Tr. 33).

14

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for DIB is predicated on the existence of a disability. 42 U.S.C. §§ 423(a); § 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

1.      Was claimant engaged in a substantial gainful activity?

15

2.      Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3.      Does the severe impairment meet one of the listed impairments?

4.      What is claimant's residual functional capacity and can claimant perform past relevant work?

5.      Can claimant do any other work considering his residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy.   *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is he determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

### DISCUSSION

Plaintiff alleges the ALJ erred in three ways: first, by not giving controlling weight to Plaintiff's treating psychologist Dr. Barnes; second, by failing  to properly evaluate Plaintiff's credibility; and third, by presenting a flawed hypothetical to the VE. (Doc. 12, at 11-20). Plaintiff's allegations are not well-taken.

***Treating Physician Rule***

Generally, medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also*

16

SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242; see 20 C.F.R. § 416.927(c)(2)[2]. A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Id*. (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). When a treating physician's opinion does not meet these criteria, an ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 416.927(c)(2). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship – length, frequency, nature and extent; (3) supportability – the extent to which a physician supports his findings with medical signs and laboratory findings; (4) consistency of the opinion with the record as a whole; and (5) specialization. § 416.927(c)(2)-(6); *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Importantly, the ALJ must give "good reasons" for the weight he gives a treating physician's opinion, reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id*. An ALJ"s reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F. 3d 646, 651 (6th Cir. 2009),

---

2. 20 C.F.R. § 416.927(d)– the original regulation section defining the treating physician rule – was recently renumbered to § 416.927(c) due to revisions not affecting the provision or rule. 77 FR 10650, at * 10656 (Feb. 23, 2012). Plaintiff and Defendant cite § 416.927(d) to explain the rule but the undersigned will cite the current and correct citation – § 416.927(c) – throughout this recommendation.

but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009).

Good reasons are required even when the conclusion of the ALJ may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in cases where a claimant knows her physician has deemed her disabled and might be bewildered when told by an ALJ she is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id.*

Plaintiff does not dispute the ALJ addressed Dr. Barnes' opinions; rather, Plaintiff argues the ALJ's reasoning for failing to give them controlling weight is flawed. Namely, he claims the ALJ improperly concluded Dr. Barnes' opinions were based on subjective complaints and he improperly relied on GAF scores. The Court may not re-weigh evidence in Plaintiff's case; rather, if an ALJ gives less than controlling weight to a treating physician, the Court must determine whether the ALJ gave good reasons for doing so. In the instant case, the ALJ did.

Dr. Barnes offered two opinions, and the ALJ discussed them both. First, the ALJ addressed Dr. Barnes' opinion that Plaintiff was "totally disabled". (Tr. 31, 270). The ALJ correctly noted Dr. Barnes failed to reference any medical findings to support her conclusion and in any event, whether an individual is "disabled" is a finding reserved for the Commissioner. (Tr. 31); SSR 96-5p, 1996 WL 374183, *5.

Next, the ALJ concluded Dr. Barnes' functional limitation opinion was not supported by her overall treatment records or the findings of other psychologists. (*See* Tr. 424-33; Tr. 31-32). The ALJ did state Dr. Barnes' finding appeared to "based heavily on [Plaintiff's] subjective complaints",

18

but he did not reject Dr. Barnes' opinion on that basis; rather, he rejected Dr. Barnes' opinion because it was inconsistent with her own treatment notes and GAF scores, as well as other medical evidence in the record. (Tr. 31). It was legally permissible for the ALJ to afford no weight or less weight to Dr. Barnes' opinion for those reasons. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (An ALJ may decide to give a treating physician's opinion less weight when it is not supported by 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is inconsistent with other substantial evidence in the case record); *see also* SSR 96-2p, 1996 WL 374188. The ALJ then cited specific medical findings inconsistent with Dr. Barnes' opinion. (Tr. 32). Specifically, Dr. Barnes' own treatment notes, which merely summarized Plaintiff's complaints, and the opinions of Drs. Gilliam, Waggoner, and White. (Tr. 32).

Next, the ALJ noted Dr. Barnes' GAF scores were inconsistent with her functional restrictions. (Tr. 31-32). Plaintiff argues that the ALJ improperly relied on GAF scores because a GAF score is not dispositive "in and of itself". (Doc. 12, at 13); *Oliver v. Comm'r of Soc. Sec.*, 415 Fed.Appx. 681, 684 (6th Cir. 2011). However, the ALJ did not use GAF scores strictly to determine whether or not Plaintiff was disabled; rather, the ALJ used Dr. Barnes' GAF scores to correctly show they conflicted with her assessment of Plaintiff's functional limitations. Namely, that Dr. Barnes at all times assigned Plaintiff GAF scores indicating only moderate symptom severity, but otherwise concluded Plaintiff was markedly limited and completely disabled. (Tr. 32). *Oliver*, 415 Fed.Appx. at 684 (the Sixth Circuit views GAF scores as "a subjective determination that represents the clinician's judgment of the individual's overall level of functioning"). Therefore, the ALJ did not err by using Dr. Barnes' GAF scores – which represented her judgment of Plaintiff's functioning – to contradict her more restrictive assessment finding Plaintiff markedly limited and disabled.

Plaintiff further argues the ALJ erred by failing to weigh the factors in 20 C.F.R. § 416.927

19

(c)(2)-(6). Plaintiff is incorrect. An ALJ is not required to explicitly exhaust every regulatory factor when he decides not to give a treating physician controlling weight; rather, the ALJ is required to consider those factors and provide good reasons for the weight he assigns. *Rogers*, 486 F.3d 234, 242 ("in determining how much weight is appropriate, [the ALJ] must *consider* a host of factors") (emphasis added); *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (the ALJ must assign weight to a treating physician and give good reasons based on factors); *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009) (An ALJ's reasons for discounting a treating physician may be brief).

In any event, the ALJ explicitly relied on two factors in giving Dr. Barnes' opinions less than controlling weight: lack of record support and inconsistency with the record. Further, the ALJ directly cited and addressed Dr. Barnes' opinions. (Tr. 31-32).  Those opinions explained Dr. Barnes' treatment relationship (*see* Tr. 31, 270), length of relationship (*see* Tr. 31, 424), and specialization (*see* Tr. 31, 270); § 404.927(c)(2)-(6). The ALJ either explicitly or implicitly considered every regulatory factor in 20 C.F.R. 404.927(c)(2)-(6) and provided good reasons for not giving Dr. Barnes opinion controlling weight ; therefore, he did not err.

### *Credibility*

A claimant's subjective complaints can support a claim for disability, but there must also be objective medical evidence in the record of an underlying medical condition. *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003). Further, "an ALJ is not required to accept a claimant's subjective complaints and may properly consider the credibility of a claimant when making a determination of disability." *Id.* at 476 (citations omitted). On review, the Court is to "accord the ALJ's determinations of credibility great weight and deference particularly since the ALJ has the opportunity, which we do not, of observing a witness's demeanor while testifying." *Id.* (citation omitted). Still, an ALJ's decision to discount a claimant's credibility "must contain specific reasons

20

for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." Social Security Ruling (SSR) 96-7p, 1996 WL 374186, *2. In reviewing an ALJ's credibility determination, the Court is "limited to evaluating whether or not the ALJ's explanations for partially discrediting [Plaintiff] are reasonable and supported by substantial evidence in the record." *Jones*, 336 F.3d at 476.

An ALJ is not bound to accept as credible Plaintiff's testimony regarding symptoms. *Cohen v. Sec'y of Dep't of Health & Human Servs.*, 964 F.2d 524, 529 (6th Cir. 1992). Analysis of alleged disabling symptoms turns on credibility. *See Hickey-Haynes v. Barnhart*, 116 Fed. Appx.718, 726-27 (6th Cir. 2004). "Because of their subjective characteristics and the absence of any reliable techniques for measurement, symptoms (especially pain) are difficult to prove, disprove, or quantify." SSR 82-58, 1982 WL 31378, *1. In evaluating credibility an ALJ considers certain factors:

> (I) [A claimant's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [a claimant's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or ha[s] taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, [a claimant] receive[s] or ha[s] received for relief of [Plaintiff's] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use or ha[s] used to relieve [a claimant's] pain or other symptoms; and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

21

20 C.F.R. § 416.929(c)(3).

Plaintiff argues the ALJ erred in assessing his credibility because the ALJ "obstinately focuses on [Plaintiff's] cocaine use" and makes an "impermissible lay determination" about Plaintiff's hallucinations. Plaintiff is incorrect.

The ALJ never suggested a correlation between Plaintiff's substance use and his credibility; rather, the ALJ recited Plaintiff's inconsistent reports of daily activity, medical records, and reports contradicting Plaintiff's alleged symptom severity to determine Plaintiff was not credible. (Tr. 29). Specifically, the ALJ discussed treatment records describing Plaintiff as "doing well" when medication compliant, and cooperative, well oriented, and logical, but hyper and manic when drug use is known to be active. (Tr. 29). The ALJ then found Plaintiff's allegations of hallucinations unsupported by the medical record. To support his conclusion, the ALJ 1) cited three specific instances or opinions contradicting Plaintiff's assertion; 2) cited medical evidence indicating Plaintiff was doing "fairly good"; 3) pointed out Plaintiff was able to manage his own daily activity; and 4) described Plaintiff's inconsistent testimony and reports of daily activity. (Tr. 29-30). These reasons are certainly specific and sufficiently clear. SSR 96-7p, 1996 WL 374186, *2.

The ALJ's credibility determination is also supported by substantial evidence. *Jones*, 336 F.3d at 476. For instance, Mrs. Hill-Owen and Ms. Flores both reported Plaintiff engaged in normal daily activity, worked out, went to the library, attended church, socialized with family daily, went to movies, and occasionally shopped for groceries, shoes, apparel, and personal items. (Tr. 181-85, 219-23). Even Plaintiff admitted he went to church, played basketball, and cooked daily; however, he later reported he "stayed in his room all day".  (Tr. 189,196).

Plaintiff attempted suicide or presented to the ER for suicidal ideations on three occasions. (Tr. 282-26, 344-48, 360-64). However, each time Plaintiff was under the influence of alcohol and

drugs and/or not taking his medication. (Tr. 276, 286, 288, 344, 347, 360). On one occasion, Plaintiff stated "he did it for attention" and Plaintiff specifically denied hallucinations, delusions, and mood swings, and reported sleeping well. (Tr. 344).

Between 2007 and 2009, Plaintiff occasionally reported hallucinations, delusions, mood swings, and harmful thoughts to Dr. Barnes. (Tr. 384, 396-97, 405) However, during the same time period, he denied them when reporting to other mental health specialists or physicians. Specifically, Plaintiff sought treatment at Blanchard four times between 2007 and 2009 and never complained of hallucinations or any symptoms similar to those he described to Dr. Barnes. (Tr. 411-22). In addition, Blanchard treatment notes described Plaintiff as alert, awake, cooperative, and well-appearing, with a calm mood and in no acute distress. (Tr. 415, 422). Century Health psychiatrists also described Plaintiff as cooperative, coherent, and focused, with a stable mood and average intelligence. (Tr. 393, 435-36).  The ALJ did not err because he gave specific and clear reasons for discounting Plaintiff's credibility supported by substantial evidence.

### ALJ's Step Five Finding

Plaintiff briefly argues the ALJ's RFC, which formed the basis for the hypothetical he presented to the VE, is not supported. Plaintiff is incorrect. The same substantial evidence supporting the ALJ's credibility determination and the weight the ALJ assigned to the treating physician supports the ALJ's RFC determination.  20 C.F.R. §§ 416.945(a)(1), § 416.929.

Plaintiff primarily argues the ALJ's hypothetical failed to accurately describe all the mental limitations the ALJ found in his decision. Specifically, he alleges the ALJ failed to provide a hypothetical question which included his finding that Plaintiff was moderately limited in concentration, persistence, or pace as required by *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 516-17 (6th Cir. 2010). Plaintiff is incorrect.

23

To meet his burden at the Fifth Step, the Commissioner must make a finding "'supported by substantial evidence that [Plaintiff] has the vocational qualifications to perform specific jobs.'" *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (quoting *O'Banner v. Sec'y of Health, Education & Welfare*, 587 F.2d 321, 323 (6th Cir. 1978)). "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a 'hypothetical' question." *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy*, 594 F.3d at 516-17; *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). "It is well established that an ALJ may pose hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact." *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

In *Ealy*, the Sixth Circuit found it was error for an ALJ to omit a restriction to moderate difficulties in concentration, persistence, and pace from his hypothetical question to the VE where the ALJ had elsewhere concluded the claimant had such restrictions. 594 F.3d at 516-17. The court found a hypothetical limiting claimant to simple tasks did not adequately convey the claimant's restrictions. *Id.* The court held: "Because the controlling hypothetical inadequately described [the claimant's] limitations, the expert's conclusion that [the claimant] could [do other work] does not serve as substantial evidence that [claimant] could perform this work." *Id.* at 517.

Here, the ALJ asked the VE to consider a hypothetical individual of the same age, education, and work experience as Plaintiff with no exertional limitations but the following nonexertional limitations:

24

> [Plaintiff has] mental limitations described in Exhibit 6F. And add to that, if you will, that the limitations that are described in that narrative, that he cannot work in environments where he has to have close contact with fellow workers and he can't do a job where he has to serve the general public or have to continue his contact with the general public.

(Tr. 85).

Exhibit 6F specifically provides, and the VE was specifically asked to consider, that Plaintiff

is *moderately limited* in his ability to:

> understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities in a schedule; maintain regular attendance, and be punctual within customary tolerances; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal work-day and workweek without interruptions from psychologically based symptoms; interact daily with the public; ask simple questions or request assistance; accept instructions and respond appropriately to criticism from supervisors; get along with coworkers or peers without distracting them; maintain socially appropriate behavior; and adhere to basic standards of neatness and cleanliness.

(Tr. 312-14).

The *Ealy* court dealt with a form similar to Exhibit 6F describing specific checked limitations but declined to resolve to what extent the checked limitations needed to be incorporated in a VE hypothetical; rather, the *Ealy* court remanded because "the ALJ's hypothetical failed to provide the [VE] with a fair summary of those conclusions." 594 F.3d at 516. Here, instead of providing a summary, the ALJ asked the VE to consider the direct source containing Plaintiff's moderate limitations. (Tr. 85.) By doing so, the VE properly considered a hypothetical containing a full picture of Plaintiff's moderate limitations concerning pace, persistence, and concentration, which is all *Ealy* requires. Therefore, the ALJ properly relied on the VE's testimony to conclude Plaintiff can perform jobs existing in significant numbers in the national and local economies.

### CONCLUSIONS AND RECOMMENDATION

25

Following review of the arguments presented, the record, and the applicable law, the Court finds the Commissioner's decision denying SSI benefits supported by substantial evidence. The undersigned therefore recommends the Commissioner's decision be affirmed.

 s/James R. Knepp II
United States Magistrate Judge


ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).